## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **IDALIA QUINONES,**<br>*Plaintiff,*<br><br>**v.**<br><br>**ELECTRIC BOAT CORPORATION,**<br>*Defendant.* | **CA No:   1:22-cv-00251**<br><br>**PLAINTIFF DEMANDS A TRIAL BY JURY** |

## COMPLAINT

This action is commenced by IDALIA QUINONES (hereinafter "Plaintiff") against ELECTRIC BOAT CORPORATION, (hereinafter "Employer," or "Defendant") to remedy and seek relief for unlawful employment practices arising under *The Age Discrimination in Employment Act of 1967*, 29 U.S.C. § 623(a) and § 623(d) ("ADEA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (Title VII), *Rhode Island Fair Employment Practices Act*, R.I. Gen § 28-5-1 *et seq*., ("FEPA"), and the *Rhode Island Civil Rights Act of 1990,* R.I. Gen. Law § 42-112-1 *et seq.* (hereinafter "RICRA").

## PARTIES

1.  Plaintiff Idalia Quinones (hereinafter "Plaintiff") resides in the City of Cranston, County of Providence, within the State of Rhode Island and formerly worked for Defendant at the Quonset Rhode Island location.

2.  Defendant Electric Boat Corporation, (hereinafter "Defendant" or "Employer") is a foreign for-profit corporation registered in the state of Delaware and a principal place of business in Groton, Connecticut.

1

## JURISDICTION AND VENUE

3.   This Court has jurisdiction to hear the Complaint pursuant to 28 U.S.C. § 1331.

4.   This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  Plaintiff's state claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.  Consideration of judicial economy, fairness, and convenience warrants this Court's exercise of supplemental jurisdiction over Plaintiff's state law claims.

5.   This Court has personal jurisdiction over Defendant because Defendant hired and employed Plaintiff in Rhode Island and thus, Defendant has the requisite minimum contacts with the State of Rhode Island and availed itself of the rights and privileges in Rhode Island by conducting interstate commerce, actively advertising to, and contracting to residents of Rhode Island; this Court exercising personal jurisdiction over Defendant does not offend the traditional notion of fair play and substantial justice.

6.   Venue of this action lies pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business in the state of Rhode Island by employing personnel such as Plaintiff, because the alleged unlawful practices occurred in Rhode Island, and because the evidence exists, in part, in Rhode Island; the state anti-discrimination laws, pursuant to RICHR's authority, are applicable to Defendant and Plaintiff and thus the judicial district of this Court is proper. Venue of this action also lies pursuant to the Title VII venue provision, 42 U.S.C. § 2000e-5(f)(3).

## ADMINISTRATIVE PROCEDURES

7.  Charges of Discrimination were timely filed by Plaintiff (pro se) with the Rhode Island Commission of Human Rights (RICHR) and co-filed with the EEOC on or about August 2, 2021 (RICHR NO.22

EAG 065-02/28 and EEOC NO. 16J-2022-00051) and on August 31, 2021 (RICHR NO.21 ESE 099-02/28 and EEOC NO. 523-2021-02022)[1].

8.  On or about May 3, 2022, the RICHR issued a Notice of Right to Sue (RICHR NO. 22 EAG 065-02/28 and RICHR NO.21 ESE 099-02/28) and submitted the request for a right to sue from the EEOC filings (EEOC NO.16J-2022-00051 and 523-2021-02022); the EEOC issued right to sue notices for both charges on May 18, 2022, enabling a private civil action to be filed.

9.  This Complaint was timely filed after issuance of the Notice of the Right to Sue.

## FACTUAL ALLEGATIONS

10.  Plaintiff is a female, who is Hispanic, and whose national origin is Puerto Rico.

11.  As such, Plaintiff is protected from discrimination and retaliation on the basis of sex, race/ethnicity, and national origin pursuant to Title VII and the state analog laws.

12.  Plaintiff is 60 years old, and as such, is protected from discrimination and retaliation on the basis of age by the ADEA and state analog laws.

13.  For many years, from 1980 to 1995, Plaintiff worked for Electric Boat at the Groton, CT location.

14.  During that time, Plaintiff worked as a welder.

15.  In or around 1995, Plaintiff left Electric Boat because of a layoff.

16.  Plaintiff then worked in welding at other companies for just over an additional decade.

17.  During the years between leaving welding and 2021 when Plaintiff returned to welding and to Electric Boat, she worked as a dealer at Twin Rivers Casino, Mohegan Sun Casino and Foxwoods Casino; Plaintiff performed this work approximately between 2006 and 2021.

18.  In or around 2020, Plaintiff began to desire to go back to welding.

---

[1] The charges are identical with the exception of a claim for retaliation added to one charge. For purposes of Court actions, therefore, the charges are combined into one complaint as the acts and omissions, laws, are virtually identical with the addition of retaliation in one charge.

19. At that time, Plaintiff had a total of 26 years of welding experience, off and on.

20. In January 2021, Plaintiff was hired by Electric Boat (hereinafter "Defendant" or "Employer") as a welder.

21. At all times relevant, Plaintiff's performance as a welder at Electric Boat met or exceeded her employer's legitimate expectations.

22. Plaintiff was to work at Electric Boat Quonset Point in North Kingston, Rhode Island.

23. For several weeks following her hire, specifically from February 2021 through March 2021, Plaintiff attended training classes and passed all welding tests.

24. In or about early April 2021, after Plaintiff's successful completion of training, she was assigned to a crew, under the immediate supervision of Jason Prestly (hereinafter "Mr. Prestly").

25. Mr. Prestly's boss was Paul Lagasse (hereinafter "Mr. Lagasse").

26. Plaintiff was the only woman on Mr. Prestly's crew and the only or one of the only under Mr. Lagasse.

27. In fact, upon information and belief, Plaintiff was one of approximately only five female welders total at Electric Boat at that location, at that time.

28. Plaintiff was also one of the only Hispanic welders on the crew; there was a Hispanic male welder on Plaintiff's crew but no other known Hispanic females.

29. Plaintiff was one of the oldest workers on the crew.

30. At all times relevant, Mr. Prestly and Mr. Lagasse treated Plaintiff differently because of her age, ethnicity, and gender.

31. As an example, Mr. Prestly and Mr. Lagasse were condescending to Plaintiff and treated her as if she were unintelligent.

32. Mr. Prestly and Mr. Lagasse did not treat other similarly-situated younger, Caucasian, and/or male welders this way; they especially did not treat welders with extensive welding experience, like Plaintiff, this way.

33. Plaintiff had problems with Mr. Prestly and Mr. Lagasse immediately, due to how they treated her.

34. In or around the first week of April 2021, Plaintiff's welding school instructor warned her stating, "Watch out for Paul [Lagasse]. Be careful he doesn't like girls on his crew."

35. That same week, Plaintiff began working with her assigned crew and was warned by her coworkers about harassment that other/prior female welders have had endured on that crew under Mr. Lagasse and Mr. Prestly.

36. Specifically, Plaintiff's co-workers assigned to her crew warned her that, "[a] young lady worked on [our] crew before and was harassed out of a job."

37. During the Plaintiff's first two weeks as a welder, instead of being assigned welding work, Mr. Prestly assigned her to sweep and clean-up work areas; Plaintiff was not assigned to welding jobs.

38. At this time, upon information and belief, Mr. Lagasse was out of work or on vacation.

39. Upon returning from vacation, Mr. Lagasse, Mr. Prestly's boss, noticed that Plaintiff was not doing welding work.

40. Mr. Lagasse then asked Plaintiff, "What are you doing?"

41. Plaintiff explained what she was doing by stating, "What I am doing is what my supervisor, Jason [Prestly], assigned me to do."

42. Later in April, Plaintiff was assigned to her first welding assignment, specifically working on a foundation with a shipfitter, as she was told by Mr. Prestly.

43.  The shipfitter was not available right away and then when the shipfitter was available, he started to work with a male welder.

44. Mr. Lagasse was upset at the Plaintiff for the work not progressing on time, even though Mr. Prestly had failed to assign her work and misdirected Plaintiff as to who she would work with.

45. Plaintiff almost fully completed the job assigned to her in about four hours.

46. Oddly, Mr. Lagasse watched the Plaintiff like a hawk during the whole time she was welding.

47. Plaintiff felt uneasy and uncomfortable that Mr. Lagasse was hovering, as if he was waiting for her to make a mistake.

48. Mr. Prestly also micromanaged Plaintiff, finding (or creating) issues with her performance and welding ability when none existed.[2]

49. Mr. Lagasse did not hover or watch similarly-situated younger, white, male welders like he hovered over and watched Plaintiffnand Mr. Prestly did not micromanage younger, white, male welders.

50. In or around the beginning of May of 2021, Plaintiff was assigned to weld in a doghouse.

51. A respirator is required for breathing protection for that particular job; however, Plaintiff had not yet been fit for a respirator.

52. Mr. Prestly told Plaintiff that getting fit for a respirator was not possible at that time due to Coronavirus restrictions.

53. Because Plaintiff was not given a proper respirator and could only wear a cotton respirator, she could only work welding in the doghouse for short periods of time due to the fumes.

54. Plaintiff had to take breaks so that she could clear her lungs.

55. Plaintiff also had other interruptions requiring her to stop her work; crane operators caused her to stop and Plaintiff also had to stop as directed to prevent contamination of other projects.

56. Plaintiff went to Mr. Prestly to speak with him about the constant interruptions and was told "Don't worry about it. You're just going to have to wait until they finish their jobs."

---

[2] Plaintiff would not have been "graduated" from welding training and allowed to weld *at Electric Boat* if she did not have sufficient skills and abilities to do so; Plaintiff had extensive prior welding experience as well yet Mr. Prestly and Mr. Lagasse *constantly* picked on Plaintiff in ways they did not pick on similarly-situated younger, white, male welders.

57. Later, Plaintiff found out that Mr. Prestly was making reports of unsatisfactory performance in the management database; however, these entries were often reported in 'batches' much later, rather than as the events were occurring.

58. For example, for reasons that cannot have a legitimate explanation, on May 11, 2021, Mr. Prestly made *five-different reports of performance issues* for Plaintiff; all indicated no action needed to be taken.

59. Plaintiff never knew about these "write-ups" and was also never coached by Mr. Prestly for any performance issues.

60. At the time, Mr. Prestly was not sharing any issues with Plaintiff with her performance or welding quality and kept telling her all was fine.

61. Due to the lack of respirator and the multiple interruptions, it took Plaintiff seven days to complete the project that was expected to take three days, for reasons that Mr. Prestly was fully aware of, and which were not under Plaintiff's control.

62. Despite Mr. Prestly knowing the delays were not Plaintiff's fault, he allowed Mr. Lagasse to direct his anger at Plaintiff for the length of time it took for the job to be completed.

63. Mr. Lagasse did not express anger and frustration towards similarly-situated, non-protected-class welders who had projects delayed at no fault of their own.

64. In or around early May of 2021, on another assignment, Plaintiff was assigned to work with a shipfitter, who had to prepare the project for Plaintiff to complete the weld.

65. The fitter made too many mistakes and another fitter, sent down by Mr. Prestly to check the work, took over the work, redoing it.

66. This extended the time to complete the project but the delay again had nothing at all to do with Plaintiff or her work; the delay was wholly about the ship fitter issue.

67. Once again, even though none of this was under Plaintiff's control, or her fault, Mr. Lagasse blamed Plaintiff for not finishing the project in a timely manner.

68. Plaintiff later learned that while Mr. Prestly was telling Plaintiff that all was fine and that he knew the delay was not her fault, he was surreptitiously (as to Plaintiff) making unfounded performance write-ups in the management database.

69. Moreover, during the time of Plaintiff's employment Mr. Lagasse's interactions and communications with Plaintiff were also increasingly harassing.

70. In fact, in addition to Mr. Lagasse hovering over and watching Plaintiff more than other welders, he criticized Plaintiff for anything and everything unjustifiably and disproportionately to other similarly-situated welders.

71. Plaintiff later found out that again, while Mr. Presently was telling Plaintiff at the time that all was fine and her work was good, he was writing her up for the exact types of issues that Mr. Lagasse harassed and nit-picked Plaintiff over.

72. At the time, Mr. Lagasse's demeanor towards Plaintiff made her feel very uncomfortable when Mr. Lagasse was in her presence.

73. For example, Mr. Lagasse would stand over Plaintiff intimidatingly, while she was working.

74. On one occasion, Plaintiff stared back at him until he became uncomfortable himself and walked away.

75. At that point, in or around May of 2021, Plaintiff requested to Mr. Prestly to report Mr. Lagasse to Human Resource for his continual harassment towards her and to request that she would be moved out of his crew.

76. Mr. Prestly looked at Plaintiff blankly and said "Oh, okay." Plaintiff then left his office.

77. At the time Plaintiff did not know that Mr. Prestly was at the same time, entering write ups in the system for unfounded criticisms.

78. Thus, Plaintiff assumed Mr. Prestly would do his supervisory duty and report Plaintiff's concerns to HR, as company policy requires.

79. Plaintiff heard nothing from Mr. Prestly about the result of his report about Mr. Lagasse to HR for around two weeks.

80. When Plaintiff tried to find out the status of her report to HR, Mr. Prestly then informed Plaintiff that *she* had to report to HR herself.

81. Despite relaying to Plaintiff's supervisor Mr. Prestly that Plaintiff wanted to report Mr. Lagasse's unfair treatment and harassing behavior and have him report it to HR, no investigation occurred.

82. EB policy requires that upon a good faith report, that report is "fairly and promptly" investigated.

83. EB did not follow policy.

84. Further, upon information and belief, Mr. Prestly had immediately informed Mr. Lagasse of Plaintiff's complaint about him but not properly (per policy) escalated Plaintiffs' concerns to HR.

85. Plaintiff was also retaliated against for trying to report Mr. Lagasse to Mr. Prestly and HR, by both Mr. Prestly and Mr. Lagasse.

86. EB policy prohibits retaliation for good faith reports of discrimination and harassment.

87. Specifically, during this same timeframe in May through into early June of 2021, Mr. Prestly made *seven (7) separate notations* about performance or policy-compliance – between *only twenty-one (21) days* between May 20, 2021 and June 11, 2021; additional notations were made by employee relations (for the same "offense") upon information and belief.

88. Mr. Lagasse harassed Plaintiff in an increasing nature.

89. In fact, instead of just watching Plaintiff constantly, to the point where co-workers made comments about it, he began to retaliate against Plaintiff for her report about him.

90. Mr. Lagasse scrutinized Plaintiff more, hovered more, and criticized more.

91. Mr. Lagasse would also give those workers who were friendly with Plaintiff a hard time.

92. During this timeframe, Mr. Prestly continued telling Plaintiff all was fine while documenting a series of performance and policy-compliance-related write-ups that Plaintiff knew nothing about.

93. At some point a few weeks after Plaintiff reported her desire to report Mr. Lagasse to Mr. Prestly, Plaintiff met with the Human Resources leader, Thomas Ricci (hereinafter "Mr. Ricci") and others in HR.

94. However, during Plaintiff's meeting with HR's Mr. Ricci, she was not afforded the opportunity to express her concerns about Mr. Lagasse's harassment and differential treatment.

95. Instead, Mr. Ricci went off on Plaintiff for "not doing her job", and accused her of being a bad welder; he threatened Plaintiff's job for no reason and based on misinformation.

96. Upon information and belief, Mr. Ricci had been given incorrect and wrongfully-damaging information about Plaintiff by either or both of Mr. Prestly and/or Mr. Lagasse; Mr. Prestly's frequent notations in the employee discipline database likely also contributed to the misinformation that Plaintiff had performance and policy-compliance problems.

97. Plaintiff attempted to interrupt Mr. Ricci, to inform him that this was not the conversation she had expected to have, and that Plaintiff had come to speak with him about Mr. Lagasse's harassment.

98. Plaintiff felt very intimidated the entire time Plaintiff was in Mr. Ricci's office being put down.

99. Mr. Lagasse and Mr. Prestly continued to target Plaintiff unfairly after meeting with HR, by hovering, scrutinizing her work, looking for mistakes, and criticizing her.

100. Notably, there were no more write-ups by Mr. Prestly from June 11, 2021, for over a month until July 2021, which was out of the ordinary given the pace of Mr. Prestly's prior notations in the management database.

101. After this quiet period where according to EB, Plaintiff had no issues (even according to Mr. Prestly or Mr. Lagasse per the management database) for over a month, or about July 13, 2021, Plaintiff was assigned to Fire Watch for a worker whose job was to gouge.

102. Gouging is when you remove defective or old welds in order to repair or dismantle equipment.

103. Upon information and belief obtained after these events, on Fire Watch an employee must have fire extinguishing equipment and be trained in its use; they must watch for fires in all exposed areas, try to extinguish them if possible or otherwise sound the alarm.

104. Plaintiff was informed she would work as "an Assistant Fire Watch" that day.

105. Plaintiff was confused, as she did not know what "an Assistant Fire Watch" was or what the job involved; she had never heard of this position and had no training on this position.

106. While acting in this role trying to figure out the job requirements without any help, Mr. Lagasse noticed Plaintiff was wearing a short sleeve shirt and directed Plaintiff to put on coveralls, which Plaintiff then did.

107. Everything was fine until suddenly later that day, Mr. Prestly and another supervisor Plaintiff did not know, asked if Plaintiff had "any personal items in her locker."

108. Plaintiff informed Mr. Prestly that she did have her bags and she was confused by the question.

109. Mr. Prestly and the other supervisor grabbed Plaintiff's bags for her, and she was harshly escorted to Human Resources.

110. At Human Resources, they informed Plaintiff of *multiple management database notations she had not been previously warned about or coached about*, prior to that day.

111. One warning was for not wearing safety goggles when Plaintiff was using a small grinder to buff and polish.

112. Plaintiff wore safety glasses and a face shield as required; Plaintiff had never been informed that safety googles were required for the small grinder (they were required for a large grinder).

113. Further, at the time, Plaintiff had been informed by supervisors and coworkers that with safety glasses and a face shield, Plaintiff was not required to wear goggles.

114. Moreover, at the time of the incident, no coworker, or either boss – Mr. Prestly or Mr. Lagasse - said anything about Plaintiff's lack of goggles.

115. Additionally, Plaintiff was not coached, warned, or written up for the lack of protective wear at the time of the incident either.

116. Similarly situated younger, male, and Caucasian employees are coached and warned prior to being written up and when they are written up, they are told about it *at the time*.

117. Notably, the last of the notations in the management database, Plaintiff learned much later, was by Paul Lagasse on July 13, 2021, for having short sleeves not coveralls on while acting in the fire watch/assistant fire watch role; this was apparently the terminatable event.

118. Plaintiff does not recall being trained on the proper attire for an "assistant fire watch."

119. Moreover, upon being told to put on coveralls she did so immediately.

120. Being terminated for this reason is pretextual for discrimination and retaliation because younger, male, Caucasian employees commit far worse violations (if not being told the proper attire for a job not trained on is a "violation") and are not terminated.

121. The woman in HR then fired Plaintiff that day, in that meeting, without allowing any explanation or discussion, especially as to the 'surprise' write ups in the management system that Plaintiff had just learned about.

122. Upon learning she was terminated, the HR lady harshly stated, "[g]ive me your badge."

123. Plaintiff slid the badge across the table to her.

124. The woman from HR then stated, "How dare you throw that at me!"

125. Plaintiff informed said she was only trying to slide it.

126. The entire exchange with HR was overly aggressive on HR's part.

127. After Plaintiff was discharged from her job, she turned around to say something to Mr. Prestly but the woman from HR yelled "You don't need to say anything to him!"

128. Plaintiff was shocked and upset at the treatment by the HR member, and shocked about her firing.

129. Plaintiff exited the building and left the property.

130. Plaintiff was harassed and discriminated against by Mr. Lagasse, because of her age, gender, because she is Hispanic/Puerto Rician, while working on a frequent basis, by staring, criticizing, and otherwise hovering near Plaintiff; he also did so by giving misinformation to HR about Plaintiff's work.

131. Upon information and belief, either on his own accord or in following direction form Mr. Lagasse, Mr. Prestly fabricated discipline events to put in the management database so as to make Plaintiff look like a performance problem, all while never telling Plaintiff anything about any write up or coaching her; this is also harassment because of age, gender and because Plaintiff is Hispanic/Puerto Rican.

132. Mr. Prestly, Mr. Lagasse, and HR knew about Plaintiff's claim that Mr. Lagasse was targeting her and harassing her, yet failed to take any action to stop it; in fact, HR failed to even listen to Plaintiff's complaints when she went to HR about Mr. Lagasse.

133. Mr. Lagasse retaliated against Plaintiff, resulting in her last write-up for the fire-watch-attire violation and her termination, because he learned of Plaintiff's reports to Mr. Prestly and HR about his harassing behavior towards Plaintiff.

134. Mr. Lagasse, along with Mr. Prestly, have a history of treating minority welders – especially female minority-race welders but also older minority-race welders – poorly and setting them up to fail and for termination.

135. Plaintiff was terminated very proximity to her reporting to Mr. Prestly and HR that Mr. Lagasse was targeting and harassing her.

136. As a direct and proximate result of Defendant's harassing, discriminatory, retaliatory actions, and termination, Plaintiff suffered loss of income and earning potential; loss of work-related benefits,

privileges, promotions, and status; experienced humiliation, and loss of standing in the community; suffered severe emotional distress resulting in physical injury; and suffered other injuries. All damages continue to date.

**COUNT ONE**
*SEX DISCRIMIANTION –DISCRIMINATORY TERMS AND CONDITIONS*
*SEX DISCRIMINATION - DISCRIMINATORY TERMINATION*
***Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3 ("Title VII"), Violation of RI Fair Employment Practices Act, R.I. Gen 1956 § 28-5-1 et seq. (FEPA) and Violation of the Rhode Island Civil Rights Act of 1990, R.I. Gen. Law § 42-112-1 et seq. (RICRA)***

137.  Paragraphs 1-136 are hereby incorporated by reference in their entirety.

138. Plaintiff is afforded protections from discrimination and harassment on the basis of sex under Title VII, FEPA, and RICHR.

139.  Defendant's agents subjected Plaintiff to a severe and pervasive, unresolved hostile work environment, and disparate treatment, because of sex, which changed the terms and conditions of her employment.

140. Defendant's agents knew of the harassing and discriminatory conduct but failed to take swift, remedial action in violation of, *inter alia*, Title VII, FEPA, and RICHR.

141. Defendant's agents terminated Plaintiff because of her sex in violation of, *inter alia*, Title VII, FEPA, and RICHR.

142. Defendant's agents' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible and unlawful considerations and violate, *inter alia*, Title VII, FEPA, and RICHR.

143. But for defendant's agents' intentional discrimination, Plaintiff would not have been terminated.

144. Defendant and its agents individually applied policies and procedures desperately against Plaintiff.

145. Such discriminatory application of the policies and practices were in a willful, intentional manner, motivated by animus, impermissible and unlawful, thus violating, *inter alia*, Title VII, FEPA, RICRA.

146. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

147. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and willful and/or wanton, punitive or exemplary damages are warranted.

148. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

**COUNT TWO**
*RACE/ETHNICITY/NATION OF ORIGIN – DISCRIMINATORY TERMS AND CONDITIONS*
*RACE/ETHNICITY/NATION OF ORIGIN – DISCRIMINATORY TERMINATION*
***Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (Title VII), Violation of RI Fair Employment Practices Act, R.I. Gen 1956 § 28-5-1 et seq. (FEPA), and Rhode Island Civil Rights Act of 1990, R.I. Gen. Law § 42-112-1 et seq. (RICRA)***

149. Paragraphs 1-136 are incorporated herein by reference in their entirety as if fully stated herein.

150. Plaintiff was protected from discrimination and harassment on the basis of race, ethnicity, and nation of origin under the 42 U.S.C. § 2000e ("Title VII"), R.I. Gen 1956 § 28-5-1 et seq. ("FEPA"), and R.I. Gen. Law § 42-112-1 et seq. (RICRA).

151. Defendant's agents subjected Plaintiff to a pervasive, unresolved hostile work environment, and disparate treatment, because of race, color, and/or nation of origin, which changed the term and conditions of her employment.

152. Defendants' agents knew of the harassing and discriminatory conduct but failed to take swift, remedial action of the violation of, *inter alia*, Title VII, FEPA, RICRA.

153. Defendant's agents terminated plaintiff because of her race, color and/ or nation of origin in the violation of, *inter alia*, Title VII, FEPA, RICRA.

154. But for defendant's agents' intentional discrimination, Plaintiff would not have been terminated.

155. Defendant and its agents individually applied policies and procedures desperately against Plaintiff.

156. Such discriminatory application of the policies and practices were in a willful, intentional manner, motivated by animus, impermissible and unlawful, thus violating, *inter alia*, Title VII, FEPA, RICRA.

157. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

158. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and willful and/or wanton, punitive or exemplary damages are warranted.

159. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

**COUNT THREE**
*RETALIATORY HOSTILE WORK ENVIRONMENT / TERMS AND CONDITIONS*
*RETALIATORY TERMINATION*
**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), Violation of RI Fair Employment Practices Act, R.I. Gen 1956 § 28-5-1 et seq. (FEPA) and Violation of the Rhode Island Civil Rights Act of 1990, R.I. Gen. Law § 42-112-1 et seq. (RICRA)**

160. Paragraphs 1-136 are hereby incorporated by reference in their entirety.

161. Plaintiff was protected from retaliatory harassment, discrimination, and termination as a result of engaging in protected conduct under Title VII/PDA, FEPA, and RICHR.

162. Plaintiff engaged in protected conduct, opposed unlawful conduct and exercised her rights under the Title VII/PDA, FEPA, and RICHR, by reporting sex-based, race-based, ethnicity-based, and national origin-based harassment and discrimination.

163. As a result of Plaintiff's protected activity, Defendant's agents subjected Plaintiff to retaliatory harassment and discrimination.

164. Defendant's agents knew about this retaliatory harassment and disparate treatment yet Defendant took no swift remedial action to remedy it.

165. Additionally, as a result of Plaintiff's protected activity, Defendant's agents terminated Plaintiff in retaliation for her protected activity.

166. But for defendant's agents' intentional retaliation, Plaintiff would not have been terminated.

167. Defendant and its agents individually applied policies and procedures desperately against Plaintiff.

168. Such retaliatory application of the policies and practices were in a willful, intentional manner, motivated by animus, impermissible and unlawful, thus violating, *inter alia*, Title VII, FEPA, RICRA.

169. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

170. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and willful and/or wanton, punitive or exemplary damages are warranted.

171. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

**COUNT FOUR**
*AGE DISCRIMINATION – DISCRIMINATORY TERMS AND CONDITIONS*
*AGE DISCRIMINATION- DISCRIMINATORY TERMINATION*
***Violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a) and § 623(d) (ADEA), Violation of RI Fair Employment Practices Act, R.I. Gen 1956 § 28-5-1 et seq. (FEPA), and Rhode Island Civil Rights Act of 1990, R.I. Gen. Law § 42-112-1 et seq. (RICRA)***

172. Paragraphs 1-136 are incorporated herein by reference in their entirety as if fully stated herein.

173. Plaintiff was protected from age discrimination and harassment under the ADEA, 29 U.S.C. § 623(a) ("ADEA") and R.I. Gen 1956 § 28-5-1 et seq. ("FEPA") and R.I. Gen. Law § 42-112-1 et seq. (RICRA).

174. Defendant's agents subjected Plaintiff to harassment and disparate treatment because of age which changed the terms and conditions of her employment in the ways stated above.

175. Defendant's agents knew of the severe and pervasive harassment and disparate treatment.

176. Defendant's agents, however, failed to take swift, remedial action to remedy the harassment and disparate treatment in violation of, *inter alia*, ADEA, FEPA, and RICRA.

177. Defendant's agents terminated Plaintiff because of her age.

178. But for defendant's agents' intentional discrimination, Plaintiff would not have been terminated.

179. Defendant and its agents individually applied policies and procedures desperately against Plaintiff.

180. Such discriminatory application of the policies and practices were in a willful, intentional manner, motivated by animus, impermissible and unlawful, thus violating, *inter alia*, ADEA, FEPA, RICRA.

181. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

182. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and willful and/or wanton, punitive or exemplary damages are warranted.

183. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

184. Plaintiff seeks multiple damages under the ADEA.

**COUNT FIVE**
*RETALIATION – RETALIATORY TERMS AND CONDITIONS*
*RETALIATION - RETALIATORY TERMINATION*
***Violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(d) (ADEA),***
***Violation of RI Fair Employment Practices Act, R.I. Gen 1956 § 28-5-1 et seq. (FEPA), and***
***Rhode Island Civil Rights Act of 1990, R.I. Gen. Law § 42-112-1 et seq. (RICRA)***

185. Paragraphs 1-136 are incorporated herein by reference in their entirety as if fully stated herein.

186. Plaintiff was protected from retaliation under the ADEA, 29 U.S.C. § 623(D) ("ADEA"), R.I. Gen 1956 § 28-5-1 et seq. ("FEPA"), and R.I. Gen. Law § 42-112-1 et seq. (RICRA).

187. Plaintiff engaged in protected conduct, opposed unlawful conduct, and exercised her rights under the ADEA, FEPA, and RICRA.

18

188. As a result of Plaintiff's protected activity, Plaintiff was subjected to retaliatory harassment and discrimination.

189. Defendant's agents terminated Plaintiff in retaliation for her protected activity in violation of, *inter alia*, ADEA, FEPA, and RICRA.

190. But for defendant's agents' intentional discrimination, Plaintiff would not have been terminated.

191. Defendant and its agents individually applied policies and procedures desperately against Plaintiff.

192. Such retaliatory application of the policies and practices were in a willful, intentional manner, motivated by animus, impermissible and unlawful, thus violating, *inter alia*, ADEA, FEPA, RICRA.

193. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

194. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and willful and/or wanton, punitive or exemplary damages are warranted.

195. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

196. Plaintiff seeks multiple damages under the ADEA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

a. Order judgment for Plaintiff against Defendant on all Counts of the Complaint and declare that the practices detailed in this Complaint are unlawful;

b. Order, for all applicable Counts, that Defendant make Plaintiff whole by awarding appropriate back pay with interest, front pay, compensation for all other lost income and benefits, earning capacity, and all other relevant entitlements and emoluments;

c.  Order, for all applicable Counts, that Plaintiff be awarded an amount of money which will fairly compensate her mental anguish, emotional pain and suffering, damage to his reputation, loss of standing in the community, and other damages incurred;

d.  Order, for all applicable Counts, that the Defendant pay Plaintiff's costs and reasonable attorney's fees resulting from this action;

e.  Order, for all applicable Counts, that the Defendant pay punitive or exemplary damages, as appropriate to punish Defendant for its malicious conduct, recklessness conduct, and/or callous indifference to the statutorily and common law protected rights of Plaintiff;

f.  Order, for all applicable Counts, that Defendant pay post-judgment interest and pre-judgment interest, including interest for all damages awarded to Plaintiff from the date the cause of action accrued, where appropriate and allowable by law;

g.  Retain jurisdiction of this action to ensure full compliance; and

h.  Order, for all Counts, such other relief to Plaintiff as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

***PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE***

June 28, 2022

Respectfully Submitted by Plaintiff,

IDALIA QUINONES
By her attorney,

 /s/ Paige Munro-Delotto
Paige Munro-Delotto, Ph.D., Esq. #9291
Munro-Delotto Law, LLC
400 Westminster Street, Ste. 200
Providence, RI 02903
(401) 521-4529
(866) 593-9755 (fax)
Email: Paige@pmdlawoffices.com